MISSOURI PACIFIC RAILROAD COMPANY *v.* LINDSEY.

4-5075

Opinion delivered May 23, 1938.

*Daggett & Daggett,* for appellants.

*Norton & Butler,* for appellees.

GRIFFIN SMITH, C. J. Edgar J. Lindsey and his wife executed two notes payable to the order of Missouri Pacific Railroad Company. One for $500 was dated September 12, 1932; the other, for $450, was dated February 6, 1932. They were renewals of similar notes given contemporaneously with contract of February 6, 1928. The notes were indorsed by E. E. and B. L. Lindsey. Conditions were: . . . "Provided, that in the event, before maturity of this note, of (a) my death, or (b) termination of a certain written agreement dated February 6, 1928, . . . this note shall become then due."

For answer to a complaint alleging nonpayment, appellees claimed that the notes were given as consideration under an agreement between John T. Stinson, director of agricultural development for the Missouri Pacific Railroad Company, and Edgar J. Lindsey; that by the agreement Lindsey became agent of the company in agricultural development work; that the company was to furnish money to be spent by Lindsey in the installation upon Lindsey's farm of poultry producing equipment, title to which was retained by the company, and that "the Missouri Pacific Railroad Company and its agents have failed, neglected and refused to carry out the terms of said agreement, thereby causing great loss and damage to the defendants."

A demurrer to the answer was overruled. Jury trial was waived. From a judgment finding for the defendants this appeal was prosecuted.

The only testimony was that of Edgar J. Lindsey, with the contract as an exhibit. This was introduced over appellant's objections.

The contract was admissible. We think, however, that the trial court misconstrued it.

It is true that by § 1 of the contract the Railroad Company proposed to employ Lindsey "as agent in agricultural development work," but other parts of the agreement disclose unconditional promises to pay.

The money was to be spent under the advice, and subject to the direction, of the Railroad Company. Lindsey agreed to "enlarge and use said outfit and so keep and care for said poultry and generally do such other things as shall, to the fullest possible extent, and always to the satisfaction of said director, cause said farm or property of the second party to be devoted to the business of poultry keeping on a profitable scale."

There was the further obligation that Lindsey should demonstrate to the people of his community the latest improved methods of poultry keeping, "so that said second party shall be a leader, authority and source of information in his community upon poultry raising, in order that such industry may be stimulated and encouraged and sustained through a community interest and activity in said industry."

Lindsey was required to render to the company a monthly inventory of poultry on hand and a daily record of eggs gathered, of chickens hatched, . . . "and of all expenses incurred and cash received in the course of said business. . . . To insure the proper use by the second party of the money advanced by the first party and the proper handling of poultry and the proceeds realized during the continuance of said business of the second party, the second party agrees to secure the amount of said funds advanced to further the business of said agency . . . by the execution of a promissory note signed by the second party and his wife and indorsed by two responsible individuals acceptable to the first party."

It was further agreed, as often as the company should require, that Lindsey would "remit and pay over to the first party, or the treasurer of the Missouri Pacific Railroad Company, any and all sums received from the sale of eggs and poultry, which sums so remitted shall be credited against the advancement made by the first party."

By § 11 it was provided that "This agreement shall continue in force for such time as the second party shall put forth interested, active and skillful efforts in connection with poultry keeping, pursuant to this agreement, but the same shall be subject to termination by the first party at any time on thirty days' notice ... if the second party shall remain in default for thirty days in accounting to the first party for the proceeds of sale of eggs, poultry, or poultry products realized upon poultry purchased with the funds advanced by the first party; or in the event of the death, ill health, incompatibility, misconduct, or unsatisfactory work of the second party. In the event of the termination of this contract [§ 12] the first party shall enter into possession of all said poultry stock, poultry buildings and removable articles at such time used by the second party in the business of poultry keeping pursuant to this agreement, with the right to sell, remove, or otherwise dispose of all of said property and credit the same upon the amount advanced by the first party to the second party. After the payment in full of the amount advanced by the first party to the second party [§ 13] with interest at five per cent. from the date of said advancement, the first party shall sell and transfer to the second party all of said poultry, poultry buildings, inclosures, appurtenances and additions to said poultry property purchased and paid for account of the first party by the second party, so that second party shall be vested with absolute title thereto free and clear of encumbrance. But until full payment of all sums advanced, [§ 14] either through profits realized from said poultry business, the sale of said poultry and poultry products, or the full payment and satisfaction of the original amount advanced by the first party to the second party, the title to all said poultry, poultry buildings and appurtenances, shall be and remain the property of the Missouri Pacific Railroad Company, and the second party shall have no right, title or interest therein until the payment by him in full to the first party for all advancements made in pursuance to this agreement."

Interest on the notes from date of execution to the period of final renewals in 1932 was regularly paid. Lindsey testified that by 1932 the business had "progressed to an unsuccessful end."

Methods by which the contract might be terminated are set out in paragraphs 11 and 12. Thereafter, by paragraphs 13 and 14, there are independent provisions requiring the railroad company, upon repayment in full of the money advanced, with interest, to sell the property to Lindsey. Lindsey was required to remit to the company moneys received from the sale of eggs and poultry, and such sums became credits "against the advancement." It is obvious that this provision, when read in connection with paragraphs 13 and 14, contemplated that the company was not to receive any of the profits realized from the business; for, when full payment had been made, the company was required to sell to Lindsey.

Our conclusion is that each party to the contract, at the time it was promulgated, contemplated that there would be profits. The railroad company was interested in promoting industrial activities along its lines in order to increase car loadings, and Lindsey wanted an opportunity to enter this particular field. He was willing to assume the risk attending the venture, but lacked the necessary capital. The railroad company had the money, and made loans evidenced by the notes. There is nothing in the contract inconsistent with the unconditional promise to pay, as expressed in the notes. The judgment is reversed, and judgment is given here for the face of the notes, with interest.